IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA and THE
STATE OF NEW MEXICO; *ex rel.*, LA
FRONTERA CENTER, INC., an Arizona
Nonprofit Corporation, RELATOR,

                Plaintiffs,

v.                                                          No. 1:15-cv-01164-KWR-JMR

UNITED BEHAVIORAL HEALTH, INC.,
*et al.*

                Defendants.

**MEMORANDUM OPINION AND ORDER DENYING RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon Relator La Frontera Center, Inc's motion for partial summary judgment on Count II, Doc. 214. Having reviewed the parties' briefs and the applicable law, the Court finds that Relator's motion is not well-taken, and therefore, is **DENIED**.[1]

**BACKGROUND**

**I.    Procedural Background**

In December 2015, La Frontera Center, Inc. ("Relator"), an Arizona nonprofit corporation, brought a qui tam suit against United Behavioral Health, Inc., United Healthcare Insurance, Inc., OptumHealth New Mexico, and United Healthcare Insurance, Inc. (collectively "United"). Doc. 1; Doc. 77 (First Amended Complaint).

---

[1] In United's response, it asks the Court to grant summary judgment in its favor on Relator's Count II reverse-FCA claim. *See* Doc. 223 at 24. The Court withholds a ruling in this opinion. The Court also reserves its ruling on Relator's motion to exclude portions of Robert Cepielik's opinion, Doc. 215, because the Court does not rely on any disputed portions in this opinion.

1

On Defendant United's motion to dismiss, the Court dismissed Counts I and IV in full and dismissed Count V in part. Doc. 146. The Court denied United's motion to dismiss Counts II and III. Doc. 146. United again moved to dismiss the remaining claims in the case—Count II, Count III, and a portion of Count V—which the Court denied. Doc. 204.

Relator now moves the Court for summary judgment on a portion of Count II of the First Amended Complaint. Doc. 214.[2]

## II.     Undisputed Facts

The State of New Mexico Interagency Behavioral Health Purchasing Collaborative (the "Collaborative") issued a request for proposal in August 2008. Doc. 199 (Stipulated Facts). United entered the Collaborative's Behavioral Health Services Contract (the "Contract") with the State of New Mexico to serve as the statewide entity from July 1, 2009, to December 31, 2013. Doc. 199. Throughout the term of the Contract, as amended (July 1, 2009, through December 31, 2013), the Collaborative paid United for Medicaid and non-Medicaid services. Doc. 199; Doc. 214, Ex. 8 (Amendment 11). The Contract provides that "[United] shall comply with all program integrity provisions of the [Affordable Care Act], including . . . [s]uspension of payments pending an investigation for credible allegations of fraud, Section 6402." Doc. 214., Ex. 8 at 3

Beginning in July 2009, United began making referrals of suspicious activity to the New Mexico Human Services Department ("HSD"). Doc. 216, ¶ 11. In January 2013, "[United] referred the issues regarding the 15 providers [at issue here] to the State per contractual requirement." Doc. 216-5, Ex. 74 at 3; Doc. 214-3, ¶ 12. After referring the 15 providers to HSD, United did nothing more because it understood that its "obligation was to report suspicious activity to the

---

[2] United also moves the Court to enter summary judgment on all remaining claims. *See* Doc. 216.

collaborative" and to "ensure that the State has a clean slate to conduct their own investigation." Doc. 214, Ex. 4, 140:4–140:22; *see also* Doc. 216, Ex. 1, art. 33.7 ("Should [United] know about or become aware of any investigation being conducted by [a state agency], [United] . . . shall maintain the confidentiality of this information."). HSD thereafter contracted with Public Consulting Group ("PCG") to "conduct[] formal audits of the 15 providers beginning in February 2013." Doc. 216-5, Ex. 74 at 3; Doc. 214-3 at 19–20, ¶ 13. PCG's audit report initially stated that "it did not uncover what it would consider to be credible allegations of fraud, nor any significant concerns related to consumer safety." Doc. 214, Ex. 4, 141:1–141:16. But the State, through HSD, later "directed PCG to remove the passage because only [HSD] may [decide] what constitutes 'credible allegations of fraud.'" Doc. 214, Ex. 7 at 3.

In June 2013, United suspended payments to the 15 New Mexico providers after it was directed by the State, through HSD, to suspend payments following the New Mexico Attorney General accepting HSDs referral for investigation. Doc. 214, Ex. 4, 138:2–138:8; 144:2–144:10; *see also* Doc. 216 at 77 (Def.'s SUMF). United thereafter placed the payments for the 15 suspended providers into a reserve account. Doc. 214, Ex. 4, 167:9–167:17. United estimated that it withheld approximately $18 million while provider payments were suspended. Doc. 214, Ex. 4, 167:18–168:5. Contemporaneous documents produced show the amount withheld to be approximately $15 million. *See* Doc. 223, Ex. A.

In July 2014, the New Mexico State Auditor released a letter titled "Fiscal Year 2013 Financial Audit of [HSD]." Doc. 214, Ex. 7 at 1. This letter was designed to update the State Legislature on the State Auditor's review of "concerns regarding [HSDs] June 24, 2013[,] Medicaid payment holds placed on 15 behavioral health service providers." Doc. 214, Ex. 7 at 1. The letter highlighted that "auditors identified a significant deficiency regarding HSD's procedures

3

for investigating allegations of fraud," and that "HSD circumvented its own established process for receiving, evaluating, concluding[,] or referring allegations of fraud to the Attorney General's MFCU for all 15 behavioral health service providers suspended by HSD in June 2013." Doc. 214, Ex. 7 at 4. The letter criticized HSDs decision to remove from the original PCG report language stating that PCG "did not uncover what it would consider to be credible allegations of fraud, nor significant concerns related to consumer safety." Doc. 214, Ex. 7 at 3. The State Auditor, however, did not determine whether the fraud allegations against the fifteen providers were credible, and at the time the letter was published, the New Mexico Attorney General's investigation remained ongoing. *See* Doc. 214, Ex. 7 at 5.

HSD did not direct United to release suspended payments until October 2015. Doc. 216, Ex. 5, ¶¶ 92–93; Doc. 214 at 12–13. United returned the suspended funds to providers on the following dates when the pay holds were released: On July 24, 2013, United released payments totaling approximately $6,900 to Service Organization for Youth, Inc.; on or around October 30, 2013, United paid $3,300,000 to Presbyterian Medical Services, Inc., to resolve litigation regarding payments for covered claims; on November 1, 2013, United released payments totaling approximately $235,000 to Youth Development, Inc.; beginning on or around October 2, 2015, at the direction of HSD, United released payments totaling $419,119.91 to Easter Seals El Mirador; on or around September 14, 2016, at the direction of HSD, United released payments totaling $1,488,280.35 to Families and Youth, Inc.; beginning on or around October 11, 2016, at the direction of HSD, United released payments totaling $4,024,998.07 to Teambuilders, Inc.; on or around November 9, 2016, at the direction of HSD, United released payments totaling $1,985,143.79 to Hogares, Inc.; on or around November 9, 2016, at the direction of HSD, United released payments totaling $852,419.18 to Border Area Mental Health; on or around November 9,

2016, at the direction of HSD, United released payments totaling $657,970.11 to Counseling Associates; on or around November 9, 2016, at the direction of HSD, United released payments totaling $198,746.24 to Southern New Mexico Human Development; on or around December 2016, at the direction of HSD, United released payments totaling $587,598,69 to Valencia Counseling Services; on or around February 9, 2017, at the direction of HSD, United released payments totaling $749,940.02 to Southwest Counseling Center; on or around March 9, 2017, at the direction of HSD, United released payments totaling $311,856,04 to The Counseling Center; on or around June 13, 2017, United paid $328,571.58 to Partners in Wellness, Inc., after it was released from the pay hold; and United paid $251,449.03 to Pathways, Inc., after it was released from the pay hold. Doc. 216, Ex. 5, ¶¶ 92–93; Doc. 214, ¶ 40.

## DISCUSSION

### I.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citation and internal quotations omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (citation and internal quotations omitted).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citation and internal quotations omitted). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (citation and internal

quotations omitted). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "[A]t the summary judgment stage[,] the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II. Analysis

Relator moved for summary judgment on Count II of the First Amended Complaint. Doc. 214 at 1. Count II alleges a violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(G). Doc. 77 at 63–66 (First Amended Complaint); Doc. 214 at 13. This section, referred to as the "reverse-false-claims provision," creates liability for "any person who . . . [1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017). The latter section does not require a false record or statement and instead requires only that the defendant "knowingly and improperly avoided an obligation to pay or transmit money or property to the Government." *See Barrick*, 878 F.3d at 1230 (cleaned up). In its motion, Relator argues that United violated the second half of this provision[3]

---

[3] In the First Amended Complaint, Relator alleges violations under both halves of 31 U.S.C. § 3729(a)(1)(G). *See* Doc. 77 at 63–66. Here, however, Relator seems to limit its argument to the second half of the subsection; nowhere in the present motion does Relator argue that the undisputed facts establish that United "knowingly [made, used, or caused] to be made or used, a false record or statement." *See* Doc. 214 at 13–15. This limit is further supported by Relator moving the Court for summary judgment "on a *portion* of Count II of the First Amended Complaint." Doc. 214 at 1 (emphasis added). Accordingly, the Court considers only whether United "knowingly conceal[ed]

when it "improperly withheld $18 million that should have either been used to pay claims for services already delivered to United's enrollees or returned to the federal government within 60 days." Doc. 214 at 1, 13.[4]

Relator must demonstrate that there is no genuine dispute of material fact and that it is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The Court denies Relator's motion for two reasons. First, Relator does not establish that United owed an obligation to pay funds to the Government at the time it alleges the violation occurred. *See infra* section II.A. Second, Relator does not establish that United knowingly and improperly avoided that obligation. *See infra* section II.B.

    A. <u>The undisputed facts do not establish that United had an established legal obligation to return withheld Medicaid payments to the State resulting from the State Auditor's letter in July 2014</u>.

Relator does not meet its burden to establish that, as a matter of law, United had an "obligation to pay or transmit money or property to the Government," *see* 31 U.S.C. § 3729(a)(1)(G), prior to HSD directing the release of the suspended payments. An "obligation" is defined as an "*established* duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Barrick*, 878 F.3d at 1230–31 (citing 18 U.S.C. § 3729(b)(3)) (emphasis in original). In other words, "the obligation must arise from some independent legal duty." *Id.* at 1231 (citing *United States ex rel.*

---

or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

[4] In its argument, Relator appears to ask the Court to grant summary judgment on claims relating to N.M. Stat. Ann. § 27-14-4E. *See* Doc. 214 at 13. However, N.M. Stat. Ann. § 27-14-4E is not referenced in Count II of the First Amended Complaint. *See* Doc. 77 at 63–66. The Court will not consider N.M. Stat. Ann. § 27-14-4E as part of the present motion because Relator moved for summary judgment only on Count II.

*Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006)). A duty to pay is not "established" if it is "merely potential or contingent." *Id.*

To set the stage: In February 2013, HSD contracted Public Consulting Group ("PCG") to "conduct[] formal audits of the 15 providers beginning in February 2013" after United observed and reported suspicious billing patterns and activity. Doc. 216-5, Ex. 74 at 3; Doc. 214-3, ¶ 13; Doc. 216 at 19–20 (Def.'s SUMF). PCG's audit report initially stated that "it did not uncover what it would consider to be credible allegations of fraud, nor any significant concerns related to consumer safety." Doc. 214, Ex. 4, 141:1–141:16. But the State, through HSD, later "directed PCG to remove the passage because only [HSD] may [decide] what constitutes 'credible allegations of fraud.'" Doc. 214, Ex. 7 at 3.

In June 2013, United suspended payments to the 15 New Mexico providers after it was directed by the State, through HSD, to suspend payments following the New Mexico Attorney General accepting HSDs referral for investigation. Doc. 214, Ex. 4, 138:2–138:8; 144:2–144:10; *see also* Doc. 216 at 77 (Def.'s SUMF). United thereafter placed the payments for the 15 suspended providers into a reserve account. Doc. 214, Ex. 4, 167:9–167:17. United estimated that it withheld approximately $18 million while provider payments were suspended. Doc. 214, Ex. 4, 167:18–168:5. Contemporaneous documents produced show the amount withheld to be approximately $15 million. *See* Doc. 223, Ex. A.

In July 2014, the New Mexico State Auditor released a letter titled "Fiscal Year 2013 Financial Audit of [HSD]." Doc. 214, Ex. 7 at 1. This letter was designed to update the State Legislature on the State Auditor's review of "concerns regarding [HSDs] June 24, 2013[,] Medicaid payment holds placed on 15 behavioral health service providers." Doc. 214, Ex. 7 at 1. The letter highlighted that "auditors identified a significant deficiency regarding HSD's procedures

8

for investigating allegations of fraud," and that "HSD circumvented its own established process for receiving, evaluating, concluding[,] or referring allegations of fraud to the Attorney General's MFCU for all 15 behavioral health service providers suspended by HSD in June 2013." Doc. 214, Ex. 7 at 4. The letter also criticized HSDs decision to remove from the original PCG report language stating that PCG "did not uncover what it would consider to be credible allegations of fraud, nor significant concerns related to consumer safety." Doc. 214, Ex. 7 at 3. The State Auditor, however, did not determine whether the fraud allegations against the fifteen providers were credible, and at the time the letter was published, the New Mexico Attorney General's investigation remained ongoing. *See* Doc. 214, Ex. 7 at 5. HSD did not direct United to release suspended payments until October 2015. Doc. 216, Ex. 5, ¶¶ 92–93; Doc. 214 at 12–13.

Relator argues that the New Mexico State Auditor's letter to the State Legislature triggered United's obligation to pay the suspended funds to the State, and because United did not timely (within 60 days) release the suspended funds to the 15 providers or return the money to the State, United violated 31 U.S.C. § 3729(a)(1)(G). *See* Doc. 214 at 14–15. To establish that United had an obligation, Relator referenced the section of Amendment 11 providing that "[United] shall comply with all program integrity provisions of the [Affordable Care Act], including . . . [s]uspension of payments pending an investigation for credible allegations of fraud, Section 6402." Doc. 214., Ex. 8 at 3.[5]

Federal law requires "a person who received an overpayment" to "report and return the overpayment to . . . the State" within "60 days after the date on which the overpayment was

---

[5] Relator also points to Article 33.5 of Amendment 11, which states that "[a]ny recouped Medicaid funds identified in any action by MFCU or other prosecutorial agency, whether the action is civil or criminal, shall be returned to the State and shall not be retained by [United]." Doc. 214, Ex. 8 at 12. This provision is irrelevant here because the funds at issue were not "recouped Medicaid funds, identified in any action by MFCU or other prosecutorial agency."

9

identified." 42 U.S.C. § 1320a-7k(d)(1)–(2) (Medicare and Medicaid program integrity provisions); *see also* 42 C.F.R. § 401.305(e) (2024) (Any overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation for purposes of 31 U.S.C. 3729."). An "overpayment" includes "any funds that a person receives or retains under . . . to which the person . . . is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B). Relator argues that this letter, which called into question HSDs investigation, placed United on notice that it was wrongfully withholding payments to the 15 suspended providers and therefore triggered the statutory 60-day deadline to return the money to the State because, if payments were not released to the providers, United was no longer entitled to retain the funds.

While United has a statutory and contractual obligation to report and return overpayments to the State, this obligation remained "merely potential or contingent" (and was not "formally 'established'"), *see Barrick*, 878 F.3d at 1230–31, until HSD directed United to release the suspended payments to the providers. In other words, the State Auditor's letter did not transform the withheld payments into an "overpayment," and therefore, while the State continued to investigate allegations of fraud, United did not have a "[present] obligation to pay or transmit money . . . to the Government." *See* 31 U.S.C. § 3729(a)(1)(G). Relator does not explain how the State Auditor had the legal authority to direct United how to administer the Medicaid funds at issue. Nor does Relator explain how a letter directed to the State legislature and pertaining to a review of HSDs procedures, and which did not conclude whether the allegations of fraud at issue here are credible, can have a legally binding effect on the Medicaid funds retained by United or otherwise place United on notice that it was improperly withholding funds. To the contrary, HSD represented that it had the sole authority to determine whether credible allegations of fraud exist. *See* Doc. 214, Ex. 7 at 3 ("HSD also stated that it directed PCG to remove the passage because

only [HSD] may make a determination regarding what constitutes 'credible allegations of fraud.'"). The undisputed facts also show that, at the time Relator argues a fixed obligation arose, the New Mexico Attorney General's investigation remained ongoing. *See* Doc. 214, Ex. 7 at 5. Thus, whether United had an "established duty" to return the suspended funds to the State 60 days from the date the State Auditor letter was published remained a "duty dependent on [the] future discretionary act[s]" of executive officials. *See Barrick*, 878 F.3d at 1226.

> B. <u>Even if the State Auditor letter triggered United's obligation to return a Medicaid overpayment to the State, the undisputed facts do not establish that United knowingly and improperly avoided that obligation.</u>

Even if the State Auditor letter formally established a present obligation to return the suspended payments to the State, Relator does not establish that United knowingly and improperly avoided that obligation. *See* 31 U.S.C. § 3729(a)(1)(G). The FCA defines "knowingly" to encompass three mental states: "[T]hat a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. 3729(b)(1)(A)(i)–(iii); *see also United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023); 42 C.F.R. § 401.305(a)(2) (2024) ("A person has identified an overpayment when the person knowingly receives or retains an overpayment. The term 'knowingly' has the meaning set forth in 31 U.S.C. 3729(b)(1)(A)."). "The FCA's scienter element refers to [the defendant's] knowledge and *subjective* beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749 (discussing 31 U.S.C. § 3729(b)(1)(A)) (emphasis added).

Here, Relator presents no evidence that United subjectively knew of, but did not timely return, a Medicaid overpayment to the State. *See* Doc. 214 at 13–15. Relator argues that United knew or should have known that the suspended funds were a Medicaid overpayment (and therefore

11

needed to be returned to the State within 60 days if not released to the providers) when the State Auditor published its letter explaining that, in addition to other critiques of its procedures, HSD should not have altered the PCG report finding that the allegations of fraud were likely not credible. *See* Doc. 214 at 14; Doc. 228 at 10–11. But Relator does not point to any statements from United's 30(b)(6) witnesses or other facts establishing United's subjective knowledge that the suspended funds became an overpayment or that it otherwise had an obligation to return the funds to the State within 60 days.

The undisputed facts, viewed in the light most favorable to the non-movant, also fall short of establishing that United was deliberately ignorant or recklessly disregarded facts tending to show that the suspended funds were improperly retained and needed to be returned to the State. After United detected suspicious activity, it "referred the issues regarding the 15 providers to the State per contractual requirement." Doc. 216–5, Ex. 74 at 3; Doc. 214, ¶ 12. HSD thereafter directed United to withhold payments to the suspended providers. Doc. 214, ¶ 16. United did nothing more because it believed that its only "obligation was to report suspicious activity to the collaborative" and to "ensure that the State has a clean slate to conduct their own investigation." Doc. 214, Ex. 4, 140:4–140:22; *see also* Doc. 216, Ex. 1, art. 33.7 ("Should [United] know about or become aware of any investigation being conducted by [a state agency], [United] . . . shall maintain the confidentiality of this information."). United's belief that it was lawfully retaining funds is further supported by its conduct after reporting the suspicious activity to HSD: United timely returned the suspended funds to providers once HSD released the pay holds and directed it to do so. *See* Doc. 216, Ex. 5, ¶¶ 92–93; Doc. 214, ¶ 40. United's compliance with HSDs directives suggests that, had it known of an obligation to return funds to the State, it would have done so. In

short, the facts demonstrate that United, at a minimum, made a good faith effort to comply with procedural requirements after detecting suspicious activity.

United also had little reason to believe that the State Auditor letter gave rise to an obligation to return the withheld funds to the State. First, the letter was directed to the state legislature, not to United. Doc. 214, Ex. 7 at 1. Second, while the letter criticized HSDs procedures—including how it handled the suspected fraud reported by United—it did not conclude whether the allegations of fraud at issue had merit. *See* Doc. 214, Ex. 7 at 5. Third, United was not given a reason to believe that the State Auditor could direct the funds at issue: Because HSD directed United to suspend the payments to the providers, it is reasonable to assume that only HSD (or possibly the Attorney General investigating the fraud claims) could direct the release of the Medicaid funds. *See generally* Doc. 77, ¶ 34 ("The New Mexico HSD is designated as the single state agency to receive federal Medicaid funds and to administer the New Mexico Medicaid State Plan." (citing N.M. Stat. Ann. § 27-2-2)). Finally, even if the letter implies that the allegations of fraud are not credible (and therefore the funds at issue were being improperly retained), HSD represented that it had the sole authority to determine whether credible allegations of fraud exist, *see* Doc. 214, Ex. 9 at 3 ("HSD also stated that it directed PCG to remove the passage because only [HSD] may make a determination regarding what constitutes 'credible allegations of fraud.'"), and the undisputed facts also show that, at the time Relator argues a fixed obligation arose, the New Mexico Attorney General's investigation remained ongoing, *see* Doc. 214, Ex. 7 at 5.

The Court concludes that, even if the State Auditor letter imposed an obligation to return a Medicaid overpayment to the state, the undisputed facts do not establish as a matter of law that United knowingly and improperly avoided that obligation.

## CONCLUSION

Accordingly, Relator La Frontera Center, Inc's motion for partial summary judgment on Count II is denied.

It is **SO ORDERED**.

                                                                      /S/_____
                                                                  KEA W. RIGGS
                                                                 UNITED STATES DISTRICT JUDGE