# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA and THE
STATE OF NEW MEXICO; *ex rel.*, LA
FRONTERA CENTER, INC., an Arizona
Nonprofit Corporation, RELATOR,

              Plaintiffs,

v.                                                              No. 1:15-cv-01164-KWR-JMR

UNITED BEHAVIORAL HEALTH, INC.,
*et al.*

              Defendants.


## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant United Behavior Health, Inc.,

United HealthCare Insurance, Inc., and OptumHealth New Mexico's (collectively "United"),

motion for summary judgment. Doc. 216. United moves for summary judgment and dismissal on

all remaining claims, which includes Count II, Count III, and part of Count V. Doc. 216 at 1. The

Court concludes that there is no genuine dispute of material fact and that United is entitled to a

judgment as a matter of law, and therefore, United's motion for summary judgment on all

remaining claims is **GRANTED**.[1]

---

[1] Relator's first response to this motion did not substantially comply with the District of New Mexico's local rules. *See* Doc. 225. Namely, Relator's statement of undisputed facts, Doc. 225 at 6–17, neither "refer[red] with particularity to [the] portions of the record upon which [Relator] relie[d]" nor complied with the limitations placed on a non-movants statement of additional facts. Doc. 235 at 1–2; *see* D.N.M.LR-Civ. 56.1(b). As a result, the Court struck Relator's response and directed it to refile in compliance with local rules. Doc. 235 at 1. The Court instructed Relator that it "[would] <u>not</u> accept any substantive changes to the briefs submitted." *Id.* at 2–3 (emphasis in original). Relator timely refiled an updated response. Doc. 236. United responded by moving to strike (or, alternatively, to disregard certain portions of) this response because, in its view, the

1

## BACKGROUND

### I.     Procedural Background

In December 2015, La Frontera Center, Inc. ("Relator"), an Arizona nonprofit corporation, brought a *qui tam* suit against United. Doc. 1; Doc. 77 (First Amended Complaint).

On United's motion to dismiss, the Court dismissed Counts I and IV in full and dismissed Count V in part. Doc. 146. The Court denied United's motion to dismiss Counts II and III. *Id*. United again moved to dismiss the remaining claims in the case—Count II, Count III, and a portion of Count V—which the Court denied. Doc. 204. Relator alleges in Count II a violation of the False claims Act, 31 U.S.C. § 3729(a)(1)–(2) (the "FCA"). Doc. 77 at 63. In Count III, Relator alleges a violation of the New Mexico Fraud Against Taxpayers Act (the "FATA"), N.M. Stat. Ann. §§ 44-9-1–44–9-14. Doc. 77 at 66. Under both Counts II and III, Relator argues that United did not timely fulfill an obligation to pay the Government money (a so-called reverse-FCA violation).  In what remains of Count V, Relator alleges that United violated the FATA, N.M. Stat. Ann. § 44-9-3(A)(1)–(2), by fraudulently inducing the State to award the contract at issue. Doc. 77 at 72.

The Court recently denied Relator's motion for partial summary judgment on Count II. Doc. 234.

---

response still did not comply with the Court's local rules and included several substantive changes. Doc. 238. The Court concludes that it will disregard changes made in the Relator's refiled response, Doc. 236, to the extent it does not comply with the local rules by not citing to the record with particularity, D.N.M.LR-Civ 56.1(b), or the Court's order prohibiting substantive changes, Doc. 235 at 2–3. Accordingly, United's motion to strike, Doc. 238, is **GRANTED IN PART**.

Relator also moved to exclude portions of Robert Cepielik's expert report. Doc. 215; *see also* Doc. 216, Ex. 5 (Cepielik expert report). The Court does not rely on any of the objected-to portions of the expert report in this opinion to determine whether a genuine dispute of material fact exists, and therefore, Relator's motion to exclude, Doc. 215, is **DENIED AS MOOT**.

## II.    Factual Background

In August 2008, the State of New Mexico Interagency Behavioral Health Purchasing Collaborative (the "Collaborative") "issued a Request for Proposal (the "RFP")" for a single statewide entity ("SE") to manage 'all covered behavioral health services, meeting various program requirements and conducting various administrative and system development functions' from July 1, 2009[,] through June 30, 2013." Doc. 216 at 8, ¶ 10 (undisputed); Doc. 199 (stipulated facts). "The SE was to manage and coordinate services funded primarily by Medicaid and then supplemented by non-Medicaid programs" and "adjudicate and pay 'clean claims,'" which excluded claims from providers who were "under investigation for fraud or abuse." Doc. 216 at 8–9, ¶¶ 11–13 (undisputed).

In October 2008, United submitted a 1024-page response (the "Response" or "RFP Response") to the Collaborative's RFP. Doc. 216 at 9, ¶ 14 (undisputed). "The Response focused on [United's] anticipated approach to patient care and provider satisfaction, along with its technical qualifications and proposed claims system." *Id.*, ¶ 15 (undisputed). The team tasked with submitting the RFP Response had "significant experience in designing claims systems," Doc. 216 at 10, ¶ 23; Ex. 18, ¶¶ 10–11 (declaration of Galit Lev-Harir), and "conducted extensive due diligence prior to the release of the RFP and throughout the drafting process, Doc. 216 at 10, ¶ 18; Ex. 18, ¶ 6. United described having substantial and relevant prior experience implementing similar programs. *See* Doc. 216 at 10, ¶ 19 (undisputed). United also had "substantial experience designing and implementing programs designed to detect fraud, waste and abuse ("FWA")" and the "Response sections related to FWA were written by individuals with significant first-hand experience in operating FWA programs, and [United's] representations regarding its FWA experience and credentials were accurate." Doc. 216 at 11, ¶¶ 25–26 (undisputed); *see also* Ex. 18,

¶ 10. United's Proposal Director, who was personally responsible for drafting the qualifications and experience section of the Response, stated that they were not aware of any false or misleading statements, and that all representations made in the Response were accurate and made with first-hand knowledge. Doc. 216 at 10, ¶ 21; Ex. 18, ¶¶ 8–11. "None of the dozens of individuals who drafted, edited, and/or reviewed the Response raised concerns about the representations made." *Id.* at 11, ¶ 28 (undisputed). After submitting the Response, a committee of Collaborative representatives awarded the contract to United. *Id.* at 11–12, ¶¶ 28–29 (undisputed).

In January 2009, United entered the Collaborative's Behavioral Health Services Contract (the "Contract") with the State of New Mexico to serve as the statewide entity from July 1, 2009, to December 31, 2013. Doc. 199. When the Contract was executed, United became the SE, or "the sole Medicaid and non-Medicaid Managed Care Organization ("MCO") responsible for coordinating delivery of government-funded behavioral health services in New Mexico." Doc. 216 at 13, ¶ 38 (undisputed). United's "primary responsibilities under the Contract were to manage, track, and report the use of funds for the provision of behavioral health services, as directed by the Collaborative." *Id.*, ¶ 40 (undisputed).

United "developed a claims adjudication system specifically for New Mexico's funding requirements." Doc. 216 at 14, ¶ 45 (undisputed). "The Collaborative conducted pre-launch readiness reviews of the claims [adjudication] system in May and June 2009, with the assistance of a third party, and there were no concerns or issues regarding functionality at launch." *Id.* at 15, ¶ 46 (undisputed); Ex. 11, 130:20–131:2 (explaining that there were multiple rounds of readiness reviews). On July 1, 2009 (the date the Contract began to run), United launched a functioning claims processing system. Doc. 216 at 15, ¶ 47; Ex. 11, 118:3–118:21. "Three months into the Contract, Collaborative CEO Linda Roebuck sent a memorandum to the entire state Legislature

[stating that United] 'continues to meet all contractual requirements,'" Doc. 216 at 15, ¶ 48 (undisputed), and "[t]he New Mexico Medical Review Association, which audited [United's] policies, procedures, capabilities, information systems, and case files on behalf of the State for Fiscal Year 2010 . . . gave [United] a compliance score of 84%, with a score of 95% in 'provider networks,' 100% in 'Reimbursement,' and 100% in 'Reporting Requirements,'" *Id.*, ¶ 49 (undisputed).

"Under the Contract, [United] received two types of payments from the State: capitated payments based on [United's] Medicaid Managed Care ("MMC") responsibilities, and administrative fee payments based on [United's] administration of FFS payments." Doc. 216 at 27, ¶ 107. Under a capitated-funding arrangement, United can retain a specified percentage of funding as profit. *Id.* at 28, ¶ 111 (undisputed); *Id.* at 30, ¶ 122 (undisputed). Because United did not profit more than 3%, it had no obligation to return any of the capitated funds to the State under the Contract. *Id.* at 29, ¶¶ 116–21 (undisputed). Regarding non-Medicaid FFS funds, United made required payments to providers while incurring a substantial loss administering the non-Medicaid programs. *See id.*, ¶ 117.

The Contract required United "to report 'fraud and abuse detection activities' and specifically to make an initial report when it became 'aware of any activity that, in [United's] professional judgment, is suspicious and may indicate that fraud or abuse has occurred." Doc. 216 at 18, ¶ 63 (undisputed). "In late 2012, [United] observed suspicious billing patterns and activity involving fifteen New Mexico providers and conducted research and audits on numerous providers in its network." *Id.* at 20, ¶ 71 (undisputed). United then reported its observations to the Collaborative in November 2012. *Id.*, ¶ 72 (undisputed). In February 2013, the New Mexico Human Services Department ("HSD") contracted with an outside auditor, Public Consulting

Group ("PCG"), to review the 15 providers' claims for services. *Id.*, ¶ 73 (undisputed). In June 2013, HSD ordered United to withhold payments to the suspended providers. Doc. 216 at 21, ¶ 77 (undisputed). United complied with the State's command. Doc. 216 at 33, ¶ 78 (undisputed). United timely returned the suspended funds to providers once HSD released the pay holds and directed it to do so. Doc. 216 at 22, ¶ 80 (undisputed); *see also* Ex. 5, ¶¶ 92–93. HSD did not direct United to release suspended payments until October 2015. Doc. 216, Ex. 5, ¶¶ 92–93.

"To deliver the services previously provided by the suspended New Mexico providers for the final months of the Contract, the Collaborative selected five Arizona providers, including Relator, to take over the operations of the suspended 15 New Mexico providers." Doc. 216 at 24, ¶ 90 (undisputed). United and Relator previously settled in arbitration after Relator alleged that United breached its contract by not paying clean claims. *See id.* at 26, ¶ 104 (undisputed).

## DISCUSSION

### I.    Standing

The Court finds that Relator has Article III standing. It is well established that "a *qui tam* relator under the FCA has Article III standing." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 (2000). But Article III still requires a plaintiff—or, in the case of a *qui tam* relator, the government—to have suffered an "injury in fact." *See id.* at 771 ("[T]hat adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor.").[2]

---

[2] "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Court

United argues that Relator lacks standing because neither New Mexico nor the United States have suffered an injury in fact. Doc. 216 at 48. In support, United points to a report submitted to the Court by HSD detailing its investigation of the allegations in the complaint. Doc. 15. In this report, HSD concluded that "Plaintiffs failed to provide substantial evidence to support a violation of § 27-14-7 . . . and therefore the complaint shall be dismissed." Doc. 5 at 4. United argues that, by way of HSDs letter, New Mexico and the United States disclaimed having suffered an injury in fact in this case. *See* Doc. 216 at 48–50.

The Court concludes that neither New Mexico nor the United States disclaimed being injured, and as a result, Relator has standing. The Court first notes that the HSD letter only addresses N.M. Stat. Ann. § 27-14-7(C). *See* Doc. 15. The Court does not read this letter as disclaiming all injuries arising out of United's contract with the State regardless of the statutes underlying the claims. But more broadly, this statute requires HSD to "conduct an investigation of the factual allegations and legal contentions made in the complaint," to "make a written determination of whether . . . a violation has occurred," and if HSD "determines that there is not substantial evidence that a violation has occurred, the complaint shall be dismissed." N.M. Stat. Ann. § 27-14-7; *see also* Doc. 146 at 26. In short, this section specifically vests HSD with authority to disclaim an injury to the State, but only for the Medicaid False Claims Act. It makes little sense to interpret this statute as giving HSD authority to disclaim the State's injury for all claims factually related to an MFCA claim.

Second, the New Mexico attorney general has the statutory authority to intervene when a *qui tam* relator files suit alleging a violation of the FATA, *see* N.M. Stat. Ann. § 44-9-5(D), and

only addresses the injury in fact requirement because it is the only element of standing that United challenges. The Court finds that the Relator satisfied standing's remaining requirements.

the FATA provides that the attorney general must investigate suspected violations or delegate the authority to investigate to "the state agency or political subdivision to which a false claim was made," N.M. Stat. Ann. § 44-9-4. Here, the attorney general stated in a letter to the Court that "HSD does not have the authority to act on behalf of the State or [to] dismiss this action." Doc. 26 at 2. It follows that HSDs own factfinding and disclaiming of injury, absent the attorney general's office expressly delegating its power to investigate, does not bind the attorney general or the State (much less the United States).

Third, United's claim that Relator lacks standing relies on HSDs determination that the "allegations in this case . . . lacked merit" because the "Relator's factual allegations lacked substantial evidence." Doc. 216 at 49. But "[t]his argument confuses weakness on the merits with absence of Article III standing." *See Davis v. United States*, 564 U.S. 229, 249 n. 10 (2011). "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . ." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Here, Relator has alleged that New Mexico and the United States "suffered an injury in fact that is concrete, particularized, and actual," *see TransUnion*, 594 U.S. at 423; it does not matter whether the claims lack substantial factual support or suffer from weaknesses on the merits. In sum, the Court finds that Relator has standing.

## II.    Summary Judgment Standard

A federal court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citation and internal quotations omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Smothers*,

740 F.3d at 538 (citation and internal quotations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citation and internal quotations omitted). The movant can satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Smith v. E. N.M. Med. Ctr.*, 72 F.3d 138, *3 (10th Cir. 1995) (unpublished). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Savant Homes*, 809 F.3d at 1137 (citation and internal quotations omitted). "For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation modified).

"On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). But "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Cardoso*, 490 F.3d at 1197 (citing *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006)) (citation modified). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Id.* (citing *Crum*, 439 U.S. at 1230)

(internal quotations omitted). "[A]t the summary judgment stage[,] the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.    Analysis

United moves for summary judgment on Count II, Count III, and Count V.[3] To succeed in its motion, United must demonstrate that there is no genuine dispute of material fact and that it is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). If United makes this showing, Relator must respond by "set[ting] forth specific facts from which a rational trier of fact could find for the nonmovant." *See Savant Homes*, 809 F.3d at 1137. The Court finds that United met, and Relator failed, to meet its burden.

### A.  Count II (FCA) and Count III (FATA): Reverse-False Claims

United moved for summary judgment on Count II and Count III. Doc. 216 at 1, 59. Relator alleges that United committed a reverse-FCA violation under the FCA (Count II) and FATA (Count III). Doc. 77 at 63–66. The FCA includes a "reverse-false-claims provision," which creates liability for "any person who . . . [1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017). The latter section does not require a false record or statement and instead requires only that the defendant "knowingly and improperly avoided an obligation to pay or transmit money or property

---

[3] The Court does not reach United's arguments about the constitutionality of the FCA and FATA *qui tam* provisions, *see* Doc. 216 at 38–47, 47–48, because it is unnecessary to this decision.

to the Government." *See Barrick*, 878 F.3d at 1230 (cleaned up). The FATA contains a nearly identical provision: "A person shall not . . . knowingly make or use, or cause to be made or used, a false, misleading, or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or political subdivision within a reasonable time after discovery." N.M. Stat. Ann. § 44-9-3(A)(8); *State ex rel. Foy v. Austin Cap. Mgmt., Ltd.*, 355 P.3d 1, 9 (N.M. 2015) ("FATA closely tracks the longstanding federal False Claims Act."). Because the FCA is the "FATA's federal analogue," New Mexico courts look to federal court cases applying the FCA for guidance. *See Foy*, 355 P.3d at 8.

The Court concludes that there is no genuine dispute of material fact and that United is entitled to a judgment as a matter of law on Count II and Count III.[4] First, the record does not establish that United owed an obligation to pay funds to the State at the time the alleged violation occurred. *See infra* section A.1. Second, even if United owed an obligation to pay funds to the State, the record lacks evidence that United knowingly and improperly avoided that obligation. *See infra* section A.2.

    1.   *United did not have an established legal obligation to return any payments to the State.*

The record lacks evidence establishing that, as a matter of law, United had an "obligation to pay or transmit money or property to the Government," *see* 31 U.S.C. § 3729(a)(1)(G), prior to

---

[4] In its amended complaint, Relator alleges that United knowingly made false statements or omissions material to an obligation to pay or transmit money to the State. *See* Doc. 77 at 63. However, the complaint seems to refer only to the misrepresentations it alleges were material to the State's decision to enter into the Contract (relevant to the fraudulent inducement claim) and does not point out any misrepresentations used by United to avoid an obligation (much less make any argument about how a post-contracting misrepresentation was made knowingly or was material to an obligation to pay money to the State). *See* Doc. 236 at 41. The Court thus understands Relator to contain its theory of liability for Counts II and III to the latter section of § 3729(a)(1)(G).

HSD directing the release of the suspended payments. An "obligation" is defined as an "*established* duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Barrick*, 878 F.3d at 1230–31 (citing 18 U.S.C. § 3729(b)(3)) (emphasis in original). In other words, "the obligation must arise from some independent legal duty." *Id.* at 1231 (citing *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006)). A duty to pay is not "established" if it is "merely potential or contingent." *Id.*

Federal law requires "a person who received an overpayment" to "report and return the overpayment to . . . the State" within "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(1)–(2) (Medicare and Medicaid program integrity provisions); *see also* 42 C.F.R. § 401.305(e) (2024) (Any overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation for purposes of 31 U.S.C. 3729."). An "overpayment" includes "any funds that a person receives or retains under . . . to which the person . . . is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

United argues that it did not have an established obligation to pay money to the State or otherwise receive (much less retain) an overpayment. Under the Contract, United received capitated payments and administrative fee (fee-for-service or FFS) payments. Doc. 216 at 27, ¶ 107 (undisputed). It first points out that it had no obligation to return any capitated funds because, under a capitated-funding arrangement, United can retain a specified percentage of funding as profit. Doc. 216 at 28, ¶ 111 (undisputed); Doc. 216 at 30, ¶ 122 (undisputed). Because United did not profit more than 3%, it had no obligation to return any of the capitated funds to the State under the Contract. Doc. 216 at 29, ¶¶ 116–21 (undisputed). Second, Relator does not allege that United

improperly kept Medicaid FFS funds. Finally, regarding the non-Medicaid FFS funds, the record shows that United paid out the required amounts to providers, and it also incurred a substantial loss administering the non-Medicaid programs and thus had no funds to return. *See* Doc. 216 at 29, ¶ 117. In short, for each method of funding, United had no obligation to return any of the funds to the State. In its response, Relator does nothing to establish that United had a present and established obligation to pay back money to the State—it provides no particularized citations to the record or cite to any legal authority. *See* Doc. 236 at 41–42.

Rather than analyzing the above funding arrangements, Relator suggests (without any citations to the record) that United had an obligation to pay money earmarked for transition costs to Arizona providers. Doc. 236 at 41. But the record does not show that United unduly retained any transition funds supposed to be paid to providers and does not include any documentary evidence of unpaid clean claims, and again, Relator neither cites to the record nor to legal authority establishing that the transition funds created an obligation to return funds to the *State*, not just to allegedly unpaid providers. *See* Doc. 240 at 17–18, ¶¶ S–U.[5] The Court finds that there is no genuine dispute of material fact and thus rejects this argument. *See Cardoso*, 490 F.3d at 1197 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

Relator also appears to re-raise the argument made in its own motion for summary judgment that United committed a reverse-FCA violation when it did not return the suspended

---

[5] To dispute that "OHNM did not receive and was not obligated to pay the transition funds that Relator alleges were unpaid under the Contract," Relator points to Exhibit 14, which is the minutes from a legislative committee's program evaluation progress report. *See* Doc. 236 at 16, ¶ 98. This does not create a genuine dispute. First, Relator fails to cite to this exhibit with particularity; while Relator includes a page range, the pages cited make up the entire exhibit. *See* Doc. 236, Ex. 14. The Court therefore disregards this paragraph and treats the fact as undisputed. Second, even if the Court were to consider this exhibit, it does not genuinely dispute that United did not receive and was not obligated to pay transition funds to the Arizona providers for the reasons listed in United's reply. *See* Doc. 240 at 17, ¶ S.

payments to the fifteen New Mexico providers. Doc. 236 at 41.[6] While Relator does not go into detail about this theory in its response, *see* Doc. 236 at 41–42, it argued in its previous motion that the New Mexico State Auditor's letter to the State Legislature triggered United's obligation to pay the suspended funds to the State, and because United did not timely (within 60 days) release the suspended funds to the 15 providers or return the money to the State, United violated 31 U.S.C. § 3729(a)(1)(G). *See* Doc. 214 at 14–15. To establish that United had an obligation, Relator referenced Amendment 11 to the Contract, which provides that "[United] shall comply with all program integrity provisions of the [Affordable Care Act], including . . . [s]uspension of payments pending an investigation for credible allegations of fraud, Section 6402." Doc. 214, Ex. 8 at 3. It argues that there were no "credible allegations of fraud" because the New Mexico State Auditor released a letter auditing HSD and criticizing its procedures and "none of the providers were ever prosecuted or sued civilly for fraud," and therefore, United was obligated to return the suspended funds. Doc. 236 at 41–42.

The Court rejected this argument in its previous order, *see* Doc. 234 at 7–11, and does so again here. While United had a statutory and contractual obligation to report and return overpayments to the State, this obligation remained "merely potential or contingent" (and was not "formally 'established'"), *see Barrick*, 878 F.3d at 1230–31, until HSD directed United to release the suspended payments to the providers. In other words, the State Auditor's letter (or the fact that none of the providers were being actively prosecuted or sued) did not transform the withheld payments into an "overpayment," and therefore, while the State continued to investigate allegations of fraud, United did not have a "[present] obligation to pay or transmit money . . . to

---

[6] In June 2013, United suspended payments to 15 New Mexico providers after it was directed by the State, through HSD, to suspect payments following the New Mexico Attorney General accepting HSDs referral for investigation. Doc. 216 at 21, ¶ 77 (undisputed).

the Government." *See* 31 U.S.C. § 3729(a)(1)(G). In its two-paragraph response, Relator does not explain how the State Auditor had the legal authority to direct United how to administer the Medicaid funds at issue. *See* Doc. 236 at 41–42. Nor does Relator explain how a letter directed to the State legislature and pertaining to a review of HSDs procedures, and which did not conclude whether the allegations of fraud at issue here are credible, can have a legally binding effect on the Medicaid funds retained by United or otherwise place United on notice that it was improperly withholding funds. The undisputed facts also show that, at the time Relator argues a fixed obligation arose, the New Mexico Attorney General's investigation remained ongoing. *See* Doc. 216 at 31, ¶ 128 (undisputed). Thus, whether United had an "established duty" to return the suspended funds to the State 60 days from the date the State Auditor letter was published remained a "duty dependent on [the] future discretionary act[s]" of executive officials. *See Barrick*, 878 F.3d at 1226.

The Court finds that the record does not support a finding that United owed (and did not timely pay) a present obligation to pay or transmit money to the State, and therefore, is entitled to a judgment as a matter of law on Claims II and III.

> 2. *United did not knowingly and improperly avoid an obligation to return overpayments to the State.*

Even if United has an established and present obligation to return funds to the State, the record does not support a finding that United knowingly and improperly avoided that obligation. *See* 31 U.S.C. § 3729(a)(1)(G). The FCA defines "knowingly" to encompass three mental states: "[T]hat a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. 3729(b)(1)(A)(i)–(iii); *see also United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023); 42 C.F.R. § 401.305(a)(2)

(2024) ("A person has identified an overpayment when the person knowingly receives or retains an overpayment. The term 'knowingly' has the meaning set forth in 31 U.S.C. 3729(b)(1)(A)."). "The FCA's scienter element refers to [the defendant's] knowledge and *subjective* beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749 (discussing 31 U.S.C. § 3729(b)(1)(A)) (emphasis added).

Here, there is no evidence in the record that United subjectively knew of but did not timely return or intentionally avoid a Medicaid overpayment to the State. Relator does not point to any statements from United's 30(b)(6) witnesses or other facts establishing United's subjective knowledge that the suspended funds became an overpayment or that it otherwise had an obligation to return the funds to the State within 60 days.

The undisputed facts also fall short of establishing that United was deliberately ignorant or recklessly disregarded facts tending to show that the suspended funds were improperly retained and needed to be returned to the State. After United detected suspicious activity, it referred the issues regarding the 15 providers to the State. Doc. 216 at 20, ¶¶ 71–72 (undisputed). HSD thereafter directed United to withhold payments to the suspended providers. Doc. 216 at 21, ¶ 77. United complied with the State's instruction. Doc. 216 at 33, ¶ 78 (undisputed). United's belief that it was lawfully retaining funds is supported by its conduct after reporting the suspicious activity to HSD: United timely returned the suspended funds to providers once HSD released the pay holds and directed it to do so. Doc. 216 at 22, ¶ 80; *see also* Ex. 5, ¶¶ 92–93. United's compliance with HSDs directives suggests that, had it known of an obligation to return funds to the State, it would have done so. Moreover, United had no reason to think that the State Auditor (or United itself) had the authority to direct the funds at issue once suspended: Because HSD directed United to suspend the payments to the providers, it is reasonable to assume that only HSD

16

(or possibly the Attorney General investigating the fraud claims) could direct the release of the Medicaid funds. *See generally* Doc. 77, ¶ 34 ("The New Mexico HSD is designated as the single state agency to receive federal Medicaid funds and to administer the New Mexico Medicaid State Plan." (citing N.M. Stat. Ann. § 27-2-2)). In short, the facts demonstrate that United, at a minimum, made a good faith effort to comply with procedural requirements after detecting suspicious activity.

The Court concludes that, even if the State Auditor letter imposed an obligation to return a Medicaid overpayment to the state, the record insufficiently establishes that United knowingly and improperly avoided that obligation. The same holds true for the capitated payments, FFS payments, and transition costs: Relator points to no evidence in the record suggesting that United subjectively knew of and intentionally avoided a present obligation to pay the State. Because Relator cannot support this essential element of Counts II and III, United is entitled to a judgment as a matter of law.

### B. Count V (FATA): Fraudulent Inducement

United moved for summary judgment on Count V. Doc. 216 at 1, 51. Relator alleges that United fraudulently induced the State to award it the Contract in 2009 by misrepresenting its capacity to perform and the quality of its services to be provided in New Mexico. Doc. 77 at 72.[7] Specifically, it alleges that United (1) "falsely certified that it met threshold, mandatory components of expertise and ability to perform the statewide obligations of an MCO required by the 2008 RFP," (2) falsely represented that it had a functioning claims adjudication system, and

---

[7] In its response, Relator now suggests liability under a false certification theory. *See* Doc. 236 at 42. The Court previously clarified, however, that the only surviving portion of Relator's FATA claim is fraudulent inducement. *See* Doc. 146 at 25 n. 1, 27–28.

(3) falsely represented that it had "implemented quality control measures" in place to "detect potential provider waste, fraud[,] and abuse." Doc. 77 at 72–77. These (fraudulent) misrepresentations and omissions, Relator argues, caused (induced) the State to award the Contract to United. Doc. 77 at 76. If Relator proves that United fraudulently induced the State to award the 2009 Contract, United becomes liable for each claim submitted to the State under the Contract. *See United States ex rel. Cimino v. Int'l Bus. Mach. Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021) ("Under longstanding Supreme Court precedent, a violation of the FCA [, 31 U.S.C. § 3729(a)(1)(A),] occurs when a person fraudulently induces the government to enter a contract and later submits claims for payment under that contract."); *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 499–500 (8th Cir. 2016) ("Under fraudulent inducement, FCA liability attaches to 'each claim submitted to the government under the contract so long as the original contract was obtained through false statements or fraudulent conduct.'" (citations omitted)); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006).

The FATA provides that a person must not "knowingly present, or cause to be presented, to . . . the state or a political subdivision . . . a false or fraudulent claim or approval" or "knowingly make or use. . . a false, misleading[,] or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim." N.M. Stat. Ann. § 44-9-3(A)(1)–(2).[8] To establish liability under a fraudulent inducement theory, Relator must prove that "(1) [United] made a 'false record or statement' ; (2) [United] knew the statement was false; (3) the statement was material [to the State's decision to reward the Contract to United]; and (4) [United] made a 'claim' for the government to pay money [under the Contract]." *Miller*, 840 F.3d at 500; *see also*

---

[8] This subsection of the FATA also closely tracks the federal FCA, 31 U.S.C. § 3729(a)(1)(A)–(B), and New Mexico courts thus look to federal court cases applying the FCA. *See supra* section II.B.

*Woodworkers Supply, Inc. v. Principal Mut. Life. Ins.*, 170 F.3 985, 994, (10th Cir. 1999); Doc. 216 at 51; Doc. 236 at 39. A "claim" means "a request or demand for money . . . when all or a portion or a portion of the money . . . requested or demanded issues from or is provided or reimbursed by the state or a political subdivision." N.M. Stat. Ann. § 44-9-2(A).

Notably, neither the FCA nor the FATA defines "false" or "fraudulent." *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). But as the above elements make clear, it is not enough that a defendant made a false statement to the government: "[A] palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act." *Hendow*, 461 F.3d at 1172. "[I]nnocent or unintentional violations do not lead to False Claims Act liability." *Id*. at 1175; *see also Lamers*, 168 F.3d at 1018 ("[I]mprecise statements or differences in interpretation growing out of a disputed legal question are . . . not false under the FCA."); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376–77 (4th Cir. 2008) ("[T]he statement or conduct alleged must represent an objective falsehood.").

To act "knowingly" means "that a person, with respect to information, acts: (1) with actual knowledge of the truth or falsity of the information; (2) in deliberate ignorance of the truth or falsity of the information; or (3) in reckless disregard of the truth or falsity of the information." N.M. Stat. Ann. § 44-9-2(C); *see also United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1206 (10th Cir. 2006) (citing 31 U.S.C. § 3729(b)(1)). "[T]he term 'actual knowledge' refers to whether a person is 'aware of' information." *Schutte*, 598 U.S. at 751. "[T]he term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* "[T]he term 'reckless disregard' similarly captures defendants who are conscious of a substantial and

unjustifiable risk that their [statements or representations] are false . . . ." *Id.* Importantly, the factfinder must look to the defendant's *subjective* beliefs, "not to what an objectively reasonable person may have known or believed." *Id.* at 749. The analysis must also be limited to the defendant's subjective beliefs *at the time* the false statement was made, "not what the defendant may have thought *after* submitting it." *Id.* at 752 (emphasis in original); *see also Hendow*, 461 F.3d at 1172.

Each of the three above-referenced statements fail to meet the elements of fraudulent inducement because, even if United's statements were false or misrepresentations, Relator does not point to any portion of the record that would cause a reasonable jury to conclude that United knew its statements were false at the time they were made.[9]

RFP Response. Relator alleged that United falsely represented its "expertise and ability to perform the statewide obligations of an MCO required by the 2008 RFP" in its RFP response. Doc. 77 at 72. Relator does not "set forth specific facts" in the record establishing that United knowingly misrepresented its qualifications and experience. *See Savant Homes*, 809 F.3d at 1137.

In October 2008, United submitted a detailed response to the Collaborative's RFP setting out its "technical qualifications and proposed claims system." Doc. 216 at 9, ¶¶ 14–15

---

[9] United does not dispute that it made claims to the State for payments under the Contract. The Court also finds it likely that, viewing the facts in the light most favorable to the non-movant, the allegedly false statements and misrepresentations made to the State (that occurred before the Contract was effectuated) would be material to the State's decision to award the Contract to United. *See United States ex rel. Janssen v. Lawrence Memorial Hosp.*, 949 F.3d 533, 540 n. 9 (10th Cir. 2020) ("Although the focus [of the materiality inquiry] is on the Government's likely conduct, [the relator] need not demonstrate actual reliance to survive summary judgment."). For the remaining elements, however, United satisfied its summary judgment burden by showing "that there is an absence of evidence to support the nonmoving party's case," *see Celotex*, 477 U.S. at 325. Doc. 216 at 51–57.

(undisputed). Importantly, to succeed in its fraudulent inducement claim, Relator must provide some evidence that United made statements "known to be a lie when it was made." *See Hendow*, 461 F.3d at 1172. Simply put, Relator provides no evidence that Relator knowingly misrepresented its expertise and ability to perform its contractual obligations *prior* to submitting the RFP response in October 2008.

First, regarding its qualifications and experience, the record clearly establishes that United had substantial and relevant prior experience implementing similar programs. *See* Doc. 216 at 10, ¶ 19 (undisputed). United's Proposal Director, who was personally responsible for drafting the qualifications and experience section of the Response, stated under oath that they were not aware of any false or misleading statements, and that all representations made in the Response were accurate and made with first-hand knowledge. Doc. 216 at 10, ¶ 21; Ex. 18, ¶¶ 8–11 (declaration of Galit Lev-Harir).[10] And to the extent United's qualifications and experience were somewhat embellished, it does not represent an "objective falsehood." *See Wilson*, 525 F.3d at 376–77. Relator does not provide any evidence disputing these statements. And even if specific portions of its prior experience were falsified, the record lacks evidence that it was done with the requisite subjective knowledge.

Second, to the extent United misrepresented its ability to perform the requirements outlined in the RFP, it did not do so knowingly and intentionally prior to submitting its response. "None of the dozens of individuals who drafted, edited, and/or reviewed the Response raised concerns about the representations made." *Id.* at 11, ¶ 28 (undisputed); *see also* Ex. 18, ¶ 13 ("At no time did

---

[10] In its order striking Relator's initial response, the Court instructed Relator to correct its citations (by citing with particularity) and to correct the format of its fact section. In its re-filed response, Relator substantially adds to its paragraph disputing this fact, *see* Doc. 238, Ex. C at 6; as a result, the Court does not consider the changes made in this paragraph.

anyone on the team preparing the Response . . . express concerns to me that the company was misrepresenting its experience and/or capabilities, that its claims processing system was not functional, or that it could not perform the RFP requirements."). In other words, no one with first-hand knowledge of the contents of the RFP response raised concerns prior to its submission that it contained false statements or misrepresented its ability to perform the program's requirements. The team charged with submitting the RFP response had "significant experience in designing claims systems," Doc. 216 at 10, ¶ 23; Ex. 18, ¶¶ 10–11,[11] who "conducted extensive due diligence prior to the release of the RFP and throughout the drafting process, Doc. 216 at 10, ¶ 18; Ex. 18, ¶ 6.[12] To establish United's knowledge, Relator points to a number of emails from employees and others questioning whether the system would be functional when it launches. *See* Doc. 236 at 9–11; Ex. 23. But the emails cited fall well-short of showing United's knowledge of its false statements: Nothing in the emails establish that the authors of the emails had first-hand knowledge of the RFP response or its contents; there was no indication that the authors told Lev-Harir or other United employees involved in the RFP response about their concerns; the employees' concerns about certain aspects of the system's eventual functionality falls well short of showing that United made "palpably false statement[s]," *Hendow*, 461 F.3d at 1172, in its RFP response; and most importantly, the emails (expressing present concerns) were written after the RFP response was submitted. *See* Ex. 23. Thus, the Court cannot conclude, based on this record, that there is a genuine

---

[11] This fact is not disputed because Relator concedes that the team may have had "experience generally" despite not having experience with "New Mexico's 'brand new' application." Doc. 236 at 9.

[12] This fact was not properly disputed. Relator did not cite to exhibits with particularity (citing exhibits 5 and 6 in their entirety) and does not question specific aspects of the drafting process such as its duration and team-size. *See* Doc. 236 at 7–8.

dispute over whether United knowingly made false statements about its ability to perform contractual requirements in its RFP response.

Claims Adjudication System. Relator alleged that United falsely represented that it was "capable of supplying New Mexico timely and accurate performance data and claims adjudication information." Doc. 77 at 77. But Relator does not "set forth specific facts" in the record establishing that United knowingly misrepresented its claims adjudication system in its RFP response or prior to entering the Contract. *See Savant Homes*, 809 F.3d at 1137.

United executed the Contract in January 2009. Doc. 216 at 13, ¶ 38. "The Collaborative conducted pre-launch readiness reviews of the claims [adjudication] system in May and June 2009, with the assistance of a third party, and there were no concerns or issues regarding functionality at launch." *Id.* at 15, ¶ 46 (undisputed); Ex. 11, 130:20–131:2 (explaining that there were multiple rounds of readiness reviews). On July 1, 2009 (the date the Contract began to run), United launched a functioning claims processing system. Doc. 216 at 15, ¶ 47; Ex. 11, 118:3–118:21.[13] Clearly,

_____

[13] Relator attempts to dispute this fact by providing several internal emails "demonstrat[ing] [that] United was not prepared for the start of the Statewide contract, and that United knew its representations were false." Doc. 236 at 9. The Court finds that this fact remains undisputed. First, as discussed *supra* note 9, Relator made significant substantive changes that extend beyond correcting unparticularized citations, and as a result, the Court does not consider the changes made. *See* Doc. 238, Ex. C at 7–8. Second, several of the citations included in a string cite at the end of the paragraph still fail to cite with particularity and instead cite to exhibits in their entirety. *See* Doc. 236 at 12. Third, even if the Court were to consider the changes made to this paragraph, none of the emails or exhibits cited (with particularity) establish that the claims adjudication system was not working at launch. In fact, "[t]hree months into the Contract, Collaborative CEO Linda Roebuck sent a memorandum to the entire state Legislature [stating that United] 'continues to meet all contractual requirements,'" Doc. 216 at 15, ¶ 48 (undisputed). Moreover, "[t]he New Mexico Medical Review Association, which audited [United's]policies, procedures, capabilities, information systems, and case files on behalf of the State for Fiscal Year 2010 . . . gave [United] a compliance score of 84%, with a score of 95% in 'provider networks,' 100% in 'Reimbursement,' and 100% in 'Reporting Requirements.'" *Id.*, ¶ 49 (undisputed). If the claims adjudication system was faulty from the outset, it is difficult to understand why, three months after launch, the

then, United believed it was capable of launching a functioning claims adjudication system because it did in fact launch a functioning claims system. Even assuming the claims adjudication system faced post-launch issues, Relator provides no evidence that United knew (or had any reason to believe) the system would eventually fail prior to entering the Contract. *See Hendow*, 461 F.3d at 1172 ("[A] palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act."). In short, the Court will not infer that United knew it was misrepresenting its claims system before entering the Contract solely from post-launch issues.

Fraud, Waste, and Abuse Measures. Relator alleged that United falsely represented that it had "implemented quality control measures" in place to "detect potential provider waste, fraud[,] and abuse." Doc. 77 at 76. The New Mexico Administrative Code provides that "the MCO shall have a comprehensive internal program integrity and overpayment prevention program to prevent, detect, preliminarily investigate, and report potential and actual program violations," and that the MCO must "have specific controls for prevention, such as claim edits, prepayment and post-payment reviews, and provider profiling." N.M. Admin. Code § 8.308.22.9. Relator does not "set forth specific facts" in the record establishing that United knowingly misrepresented its fraud, waste, and abuse detection system in its RFP response or prior to entering the Contract. *See Savant Homes*, 809 F.3d at 1137. In fact, in the section of its brief where Relator argues that the fraudulent inducement claim should proceed to the jury, it does not even mention United's alleged misrepresentations regarding fraud, waste, and abuse. *See* Doc. 236 at 39–40.

---

Collaborative CEO and New Mexico Medical Review Association would make statements and findings suggesting the opposite.

United had "substantial experience designing and implementing programs designed to detect fraud, waste and abuse ("FWA")" and the "Response sections related to FWA were written by individuals with significant first-hand experience in operating FWA programs, and [United's] representations regarding its FWA experience and credentials were accurate." Doc. 216 at 11, ¶¶ 25–26 (undisputed); *see also* Ex. 18, ¶ 10. Moreover, as stated above, the Court will not infer United's pre-contractual knowledge of the falsity of its statements and representations solely from post-contractual performance issues with its FWA program. Because Relator does not dispute that United's representations regarding its FWA measures were accurate and does not point to any evidence to raise a genuine dispute over whether United made false statements regarding its compliance with the State's FWA requirements—much less point to any evidence establishing United's knowledge that it made false statements and misrepresentations about its FWA measures when submitting the RFP response or prior to entering the Contract—the Court concludes that United did not knowingly misrepresent its FWA program.[14]

In sum, Relator's fraudulent inducement claim cannot survive summary judgment.

---

[14] In its statement of additional facts, Relator states that "United did not have an effective fraud detection system in place, as evidence[d] by its failure to timely identify the 'fraudulent activity' of the fifteen New Mexico providers that were ultimately suspended." Doc. 236 at 18, ¶ a. The Court finds that this does not create a genuine dispute. First, the Court will not infer the falsity of pre-contract representations (or knowledge of such misrepresentations) solely from post-contract performance issues. Second, Relator's proposition is not established by the citations it includes in support. Finally, its assertion that United's fraud system was not effective for the entire duration of the Contract (which itself lacks support in the record) is directly contradicted by the Collaborative CEO stating that United continued to meet all contractual requirements after three months. Doc. 216 at 15, ¶ 48 (undisputed).

**CONCLUSION**

The Court concludes that there is no genuine dispute of material fact and that United is entitled to a judgment as a matter of law on Count II, Count III, and Count V. *See* Fed. R. Civ. P. 56(a).

**It is THEREFORE ORDERED** that United's motion for summary judgment on all remaining claims, Doc. 216, is granted; United's motion to strike Relator's response, Doc. 238, is granted in part; Relator's motion to exclude portions of Robert Cepielik's expert report, Doc. 215, is denied as moot; and United's motion for extension of time to file a response/reply, Doc. 221, is granted.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE